Rich Curtner
Federal Defender
Daniel Poulson
Legal Writing and Research Specialist
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400
Attorneys for Petitioner

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THOMAS R. SADDLER,<br><br>               Petitioner,<br><br>vs.<br><br>JOHN CONANT,<br><br>               Respondent. | NO. 3:14-cv-00105-SLG-DMS<br><br>**MERIT BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner, Thomas R. Saddler, by and through counsel, hereby files his merit brief in support of the petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254.

## I.   FACTUAL BACKGROUND

### A.  THE MISTRIAL DECLARATION

The morning of Wednesday, August 24, 2005, the second day of trial in State of Alaska v. Thomas R. Saddler, promised to run like clockwork. Saddler, then 55, and his codefendants, Stephen Hoyt and Curt J. Friedmann, were charged with an array of felonies for allegedly operating a meth lab out of a trailer in Wasilla. The charges were serious and stakes were high all around, but Tuesday's proceedings had finished ahead of schedule, even with three defense attorneys and a prosecutor crowded into the courtroom. Despite a mid-morning power outage that scrambled the courthouse computers, a jury was sworn and

seated.[1] Wednesday morning's opening statements were expected to be succinct, with trial moving swiftly into the state's case.[2]

At approximately 10:50 a.m., the jurors filed into Courtroom 2. They barely had time to settle into their seats when the judge asked a startling question:

> All right, well, good morning, everybody. Obviously, something came up. And what came up is going to require me to postpone this trial, what we call continue this trial, for a period of at least 45 days. My question to you is, is there anybody here who would not be – who can't be available at that time?

[Tr. 165-166]

Five jurors raised their hands. The judge noted their respective numbers. Without pausing to solicit input from the parties, the judge suddenly declared, "Under those circumstances, in the interests of justice, I'm going to have to declare a mistrial, and we will re-calendar this case."[3] It was now 10:51 a.m.[4] It had taken less than one minute for the court to declare a mistrial.[5] The trial was rescheduled for November. Until then, the defendants would remain in custody.

## B. PRELUDE TO THE MISTRIAL: THE PROSECUTION FAILS TO TIMELY PROVIDE DISCOVERY AND THE DEFENSE AGREES TO A CONTINUANCE

Had it proceeded to trial, the prosecution's case against Thomas Saddler would have likely called for few live witnesses. The primary evidence against Saddler and his codefendants

---

[1] Doc. 15-3, Tr. 84-87.

[2] Tr. 87-90 (The prosecutor reserved 45 minutes for opening statements. Although he requested more time, counsel for Mr. Saddler predicted "realistically" he would need at most 10 minutes for opening statements).

[3] Tr. 166.

[4] Audio of trial, Exhibit A, filed conventionally, at 10:51. The audio recording of the trial proceedings were properly before the Court of Appeals on direct review. See Alaska R. Appellate Procedure 210(a) ("The record on appeal consists of the entire trial court file, including the original papers and exhibits filed in the trial court, the electronic record of proceedings before the trial court, and transcripts, if any, of the trial court proceedings") (emphasis added).

[5] Id.

would consist of so-called precursor chemicals – household products including cold medicine, iodine, and acetone, as well as less common chemicals like toluene, red phosphorous and muriatic acid, and also various jars filled with unknown liquids. All of these items had been seized from Saddler's trailer pursuant to a search warrant.[6]

The chemicals, however, were not enough to prove that Saddler possessed them with intent to manufacture drugs. Although the trailer was listed under his name, Saddler had been standing outside when the police executed the search warrant.[7] He had declined to make any statements about the trailer's contents.[8] He did explain that he had only recently returned from Anchorage, and his car was still loaded with groceries. In pretrial hearings, Saddler's attorney had telegraphed that he would be arguing to the jury that Saddler was a bystander, the charges a product of circumstances.[9]

On the other hand, circumstances could change. The prosecution was eager to introduce evidence that Saddler had been charged once before in 2003 for second degree misconduct involving a controlled substance, although the evidence had been suppressed for a Fourth Amendment violation and the charge dismissed.[10] Saddler had also been the subject of another unrelated drug investigation.[11] Not surprisingly, the prosecutor in the current case vigorously argued that such evidence would be relevant under Alaska Rule of Evidence 404(b)(4) to prove Saddler's knowledge and lack of mistake or accident.[12] After hearing oral arguments, the court narrowly concluded that such evidence was inadmissible. While such evidence was probative of Saddler's intent, the judge ruled, the danger of unfair prejudice to the defense outweighed its probative value under Alaska Rule of Evidence

---

[6] Exhibit B at 1-2.
[7] Id.
[8] Tr. 82-84, 90-98.
[9] Tr. 104-105.
[10] Tr. at 82-83. See 3AN-03-13571 CR.
[11] Tr. at 82.
[12] Tr. 90-98.

403.[13] In so ruling, however, the trial court made it clear that such evidence would be admissible if Saddler's counsel "opened the door."[14]

As it turned out, the admissibility of the 404(b) evidence was not the only thing on Saddler's attorney's mind that morning. He reported to the court that he had made a startling discovery: the state had not provided him with a copy of the lab report of the alleged precursor chemicals, nor a copy of the expert notice describing the state's expert's testimony at trial.[15] Mr. Hoyt had similarly not received the expert notice or the lab report. Of the three men, Mr. Friedmann alone had received both the lab report and the expert notice.[16]

Because of the state's failure to disclose these materials, counsel for Mr. Saddler requested a sanction. He acknowledged that a continuance would ordinarily be the preferred remedy.[17] However, he pointed out that he had never announced ready for trial[18] and that he intended to have the substances retested and retain his own expert, which would necessitate holding over the jury for as long as 90 days.[19] He predicted that the trial court would not be able to hold the jury for that length of time.[20] Counsel lobbied the court to suppress the state's expert's testimony and, consequently, admission of the state's lab

---

[13] Tr. 109.
[14] Id.
[15] Id.
[16] Tr. 109-110.
[17] Tr. 117 ("And in the absence of that, if the evidence – the first thing the court can do is get a continuance, I agree with that. It's continuance, exclusion, as I understand it, and mistrial.")
[18] The court had previously denied a defense motion for a continuance. During a pretrial hearing held on August 22, 2005, counsel for Mr. Hoyt had requested a 60-day continuance because he had only recently been retained as counsel and was not prepared for trial, which was scheduled to begin the following day. The motion was joined by both Friedmann and Saddler. However, the trial judge denied the motion, stating, "I can't have people hiring counsel the week before trial and then trying to get a long continuance, because the continuance is going to be really long." Tr. 62.
[19] Tr. 117.
[20] Tr. 118 ("The court would have to hold a jury that's already been seated for probably 90 days. And I don't think the court can do that."); Tr. 120 ("So I look at it as a continuance is first, under the – under what the rule says. And if it's not adequate here, because I don't think the court could hold a seated jury for 90 days, then [precluding the expert from testifying] would be my request.")

reports.[21] Suppression was the best remedy, he argued, because the state had pushed the case to trial over the defense objection, and had failed to make disclosure of critical evidence.[22]

The defense attorney viewed a mistrial as a more drastic remedy compared to suppressing the evidence.[23] The court, however, took the view that a mistrial was "effectively" the same thing as a continuance.[24] Mr. Saddler's attorney disagreed. He stated his position thusly: "I think the adequate remedy and the fair remedy would be preclusion of the expert from testifying."[25] When the court asked why a mistrial would not be an adequate remedy, counsel for Mr. Saddler repeatedly stated that there would be a double jeopardy problem.[26]

After hearing testimony from both Saddler's attorney and a paralegal from the Palmer district attorney's office, the court concluded that it could not make any finding as to the underlying nature of the discovery violation.[27] Because it could not find that the discovery violation had been willful (a point which the defense readily conceded), the court stated that it would offer counsel for Mr. Hoyt and Mr. Saddler a continuance.[28] He then asked the attorneys whether they would consent to this remedy.[29] After taking a brief recess to confer, counsel for Mr. Saddler reported that he "would accept the court's proposal for a continuance, if that's what the court finds is appropriate remedy."[30]

---

[21] Tr. 117.
[22] Tr. at 124, 126 ("The reason I say that is, if the state neglects to do something properly, whether through negligence or willful behavior, if they neglect to do something properly, the court, I think, has … a responsibility not to let them out when this is the case. The precursors are the case.")
[23] Tr. 117.
[24] Tr. 122.
[25] Tr. 124.
[26] Tr. 118 ("Well, if that were to happen, Judge, I would come right back in here and make a double jeopardy argument. Because I'm not asking for a mistrial, I'm asking for an exclusion..."), Tr. 125 ("…But what I will say is if the defense doesn't ask for a mistrial and the court grants a mistrial because you think that's the adequate remedy, I think my client's got a double jeopardy issue.").
[27] Tr. 159 ("I'm in one of those rare situations where I can't make a finding…")
[28] Id.
[29] Id.
[30] Tr. 160.

Shortly before the jurors were called back into the courtroom, the judge explained to the attorneys that he would be informing them that trial would be continued for "at least" 45 days (not, as the defense proposed, 90 days) and that he would ask the jurors whether they would be available at the end of that period.[31] The trial judge did not seek any input, either from the prosecutor or the defense attorneys, about the proper procedure for declaring a mistrial. Less than one minute after the jury was called back into the courtroom, a mistrial was declared. The trial was then continued approximately 90 days, to November, 2005.[32]

### C. THE MOTION TO DISMISS AND THE TRIAL COURT'S WRITTEN FINDINGS

A month after the mistrial declaration, Stephen Hoyt filed a motion to dismiss, arguing that the judge had failed to sufficiently develop the record in support of his declaration of a mistrial and that any retrial would be barred on double jeopardy grounds. On October 4, 2005, Curt Friedmann joined that motion. The state requested an extension to respond, which was granted. However, the state missed its deadline yet again. There was still no opposition when, on October 31, 2005, Saddler filed his own motion to dismiss, asserting the same double jeopardy problem.

By the time trial call took place on November 15, 2005, no opposition had been filed. Because the court announced its intent to rule on Hoyt's motion, Saddler withdrew his motion and joined that of his codefendants'. The trial court then issued a previously-drafted order granting the motion. In its order, the court reached a number of conclusions, bolstered by citations to the trial transcripts.[33]

---

[31] Tr. 163.
[32] Id.
[33] Exhibit B at 19 ("Fairly read, the transcript of the proceeding supports the description of those events set forth above in this order.").

First, the court acknowledged that the defendants had consented to a continuance. The court did not suggest anywhere in its order that counsel for Mr. Saddler had waived his objection to a mistrial or somehow cajoled the court into making its decision.[34]

Second, although the jurors' unavailability *could* have warranted manifest necessity to justify a mistrial, the court conceded that it should have engaged in a more thorough inquiry about the basis for their alleged unavailability:

> There is no indication in the record as to why the five jurors in question would not have been available on the newly set trial date, nor did the court inquire to confirm that they in fact would suffer a sufficiently substantial hardship that they would have to be excused on that new date.[35]

Finally, the trial judge ruled that the state, by failing to file its opposition on time, conceded that the record was inadequate to support a mistrial. The court agreed, finding this concession to be "well taken."[36] Dismissal was therefore appropriate.[37]

However, the court stayed its order and permitted the state ten days to file a motion for reconsideration. In the meantime, the defendants were released on unsecured appearance bonds.

## D. THE TRIAL COURT REINSTATES THE CHARGES, RELYING ON AN ERRONEOUS LEGAL THEORY

In its motion for reconsideration, filed on November 23, 2005, the state argued for the first time that the court was entitled to discharge the jury under Alaska Rule of Criminal

---

[34] Exhibit B at 19 ("To summarize, having found that to the extent that the state did not provide discovery, that failure was not wilful, and having found that a continuance would cure the prejudice identified by counsel, the court asked if defendants wanted to continue the trial or go to trial. Defendants accepted a continuance.")

[35] Id. at 20.

[36] Id. at 15.

[37] Id. at 20-21. This is how the Court of Appeals described it: "After considering this motion to dismiss, Judge Smith concluded (in retrospect) that he had failed to conduct a sufficient inquiry to establish that the five jurors would actually have been unavailable if the trial had been continued for 45 days. Thus, Judge Smith concluded, the record failed to demonstrate that it was manifestly necessary to declare a mistrial." Friedmann v. State, 172 P.3d 831, 835 (Alaska App. 2007).

Procedure 27(d)(3).[38] That provision governs the discharge of a jury when jurors become unavailable prior to deliberations. Under this procedure, the state argued, the court was not required to make findings of manifest necessity.[39] In a Notice of Intent to Rule as well as a subsequent Order Granting Motion for Reconsideration issued January 26, 2006, the trial court accepted this logic, reasoning that discharging a jury under Criminal Rule 27(d) "did not implicate double jeopardy at all." Accordingly, even though the record was insufficient to establish manifest necessity to justify a mistrial, the judge rescinded his declaration of a mistrial and declared that the jury had been discharged under the independent authority of Criminal Rule 27(d)(3).[40] The matter was then rescheduled for trial starting February 27, 2006.

On February 27, Saddler remanded into custody and entered a plea of no contest to each of the charges pursuant to <u>Cooksey v. State</u>,[41] reserving his right to renew his double jeopardy argument on appeal. Because there was no agreement between the parties, sentencing was open to the court. He was sentenced on September 29, 2006 and received a composite sentence of 20 years.

Curt Friedmann also entered a <u>Cooksey</u> plea, pleading no contest to a single count of misconduct involving a controlled substance in the second degree and reserving the double

---

[38] Exhibit B at 29-30.

[39] Rule 27(d) provides: Juror Unable to Continue. If, prior to the time the jury retires to consider its verdict, a juror is unable to perform or is disqualified from performing the juror duty, the court may order the juror to be discharged. If an alternate juror has not been impanelled as provided in the rules,

(1) the trial may proceed with the other jurors with the consent of the parties, or

(2) another juror may be sworn and the trial may begin anew, or

(3) the jury may be discharged and a new jury then or afterwards formed.

[40] Exhibit B at 49 ("It would appear to the court that a detailed inquiry is less necessary in the context of a discharge of a jury pursuant to Criminal Rule 27(d) than to a declaration of a mistrial.") and 60 ("The manifest necessity standard was adopted because of the substantial double jeopardy implications of declaring a mistrial. The procedure adopted by Criminal Rule 27 does not implicate double jeopardy at all."). The trial court's ruling on this point was, of course, contrary to well-established law and was summarily rejected by the Court of Appeals in <u>Friedmann</u>.

[41] <u>Cooksey v. State</u>, 524 P.2d 1251, 1255-57 (Alaska 1974) (authorizing this procedure).

jeopardy question for review. However, under an agreement reached with the state, two other charges of misconduct involving a controlled substance in the second degree were dismissed. On August 30, 2006, Friedmann was sentenced to five years, one year suspended, and was placed on probation for five years.

Stephen Hoyt absconded after being released from custody. He died on May 30, 2008.

### E.  ON DIRECT APPEAL, SADDLER'S DOUBLE JEOPARDY CLAIM IS DENIED ON THE MERITS

Saddler lodged his notice of appeal on January 10, 2007. In his briefing, he argued that the trial court had violated his right against double jeopardy under the U.S. and Alaska Constitutions by reinstating the proceedings against him.[42]

Saddler's co-defendant Friedmann pursued his own appeal arguing the same issue. In Friedmann v. State, decided December 21, 2007, the Alaska Court of Appeals concluded that the trial judge's decision to discharge the jury under Alaska Criminal Rule of Procedure 27(d)(3) was the equivalent of a declaration of a mistrial which implicated the double jeopardy provisions of the U.S. and Alaska Constitutions.[43] However, the court construed certain statements by Friedmann's counsel as effecting consent to a mistrial, which waived the double jeopardy claim.[44]

In Saddler v. State, decided March 25, 2009, the Alaska Court of Appeals similarly chose to deny Mr. Saddler's appeal. This time, the Court of Appeals decided that Saddler was estopped from raising a double jeopardy claim on appeal because he had invited the trial court's error. Nonetheless, the Court of Appeals addressed the merits of the argument and held that, in any event, the trial judge could reasonably conclude that there was manifest necessity for the mistrial. Saddler v. State, 2009 WL 793739 (Alaska App. 2009).

---

[42] Exhibit B at 80.
[43] Friedmann v. State, 172 P.3d 831, 836 (Alaska App. 2007).
[44] Id. at 837.

*Thomas R. Saddler v. Jon Conant*
Case No. 3:14-cv-00105-SLG-DMS                                                    Page 9

On May 5, 2009, Mr. Saddler petitioned the Alaska Supreme Court for review, raising both a challenge to the estoppel argument as well as the underlying double jeopardy claim. The Alaska Supreme Court denied the petition on August 27, 2009.

### F.  IN POST-CONVICTION RELIEF PROCEEDINGS, THE COURT OF APPEALS DENIES SADDLER'S CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Saddler, appearing *pro se*, filed an application for post-conviction relief on July 24, 2009.[45] In his post-conviction relief application, he alleged that he had been deprived of effective assistance of counsel under the U.S. and Alaska Constitutions. Specifically, he alleged that his trial attorney unreasonably failed to investigate two potential alibi witnesses, and had provided erroneous legal advice when he advised Saddler to accept the Cooksey plea. Saddler stated that his trial attorney had assured him that he would win the appeal "hands down" and that the appeal was "the fastest way to get out of jail."[46] Saddler additionally asserted that his trial attorney had incorrectly informed him that Saddler was precluded from seeking interlocutory review of the double jeopardy claim, because the decision was not final.[47]

In an affidavit, Saddler's former attorney responded that he had not bothered to interview Saddler's alibi witnesses because Saddler had indicated they "would say whatever [Saddler] needed them to say."[48] Although he disputed claiming that the appeal was "certain" to succeed, he did admit to believing the Cooksey plea "was the best and only avenue for Mr. Saddler" in order to preserve the double jeopardy claim.[49]

The Superior Court appointed Saddler post-conviction relief counsel. An evidentiary hearing was held on August 25, 2011. Both Saddler and his former attorney testified.

---

[45] 3PA-09-1779 CI.
[46] Exhibit D at 33-35, 56.
[47] Exhibit D at 52-53.
[48] Exhibit D at 158.
[49] Exhibit D at 160.

Saddler again reiterated that he accepted the Cooksey plea because he believed the quickest route to freedom was to pursue the double jeopardy claim on appeal, because the only alternative was to wait for a trial which, according to his attorney, would be as much as one year away.[50] He testified that his attorney had assured him that the convictions were certain to be overturned.[51]

Saddler's former attorney admitted that he had confidence in the merits of the appeal and that he advised Saddler to accept the Cooksey plea, but he denied telling Saddler that the appeal was certain to be granted.[52] He admitted that he had no experience with appeals.[53] He never mentioned ever advising Saddler that, rather than enter a Cooksey plea or go to trial, his client was entitled to seek interlocutory review of the double jeopardy claim prior to retrial.

The Superior Court denied the PCR application, finding that counsel was not ineffective. The Court of Appeals affirmed.[54] Mr. Saddler petitioned the Alaska Supreme Court for review on December 13, 2013. The Alaska Supreme Court denied the petition on February 28, 2014.[55] Saddler then filed the instant petition for a writ of habeas corpus, which was received by the U.S. District Court on June 2, 2014.[56] An amended petition was filed on July 28, 2014.

---

[50] Exhibit E at 84-85.
[51] Id.
[52] Exhibit E at 41-42.
[53] Exhibit E at 72.
[54] Saddler v. State, No. A-11147, 2013 WL 6228014 (Alaska App., 2013).
[55] Case No. S-15418.
[56] It appears that Mr. Saddler mailed the application on April 17, 2014, which would be the effective date of filing under the prison mailbox rule. Rule 3(d) of Rules for Section 2254 Cases.

## II.     ARGUMENT

### A. TIMING

The substantive standards of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) govern Mr. Saddler's petition.[57] AEDPA imposes a one-year statute of limitations for the filing of habeas petitions. 28 U.S.C. § 2244(d)(1). AEDPA's statute of limitations is tolled during the time in which a "properly filed" state habeas petition is pending. 28 U.S.C. § 2244(d)(2). A state habeas petition is "pending" as long as the ordinary state collateral review process continues.[58] Accordingly, a "pending" petition generally includes the time "between a lower court decision and a filing of a new petition in a higher court."[59] Based on the dates recounted above, Mr. Saddler's federal habeas corpus petition is timely.

### B.  STANDARD OF REVIEW

When a claim is adjudicated on the merits in state court, a habeas petitioner must establish either that the state court's decision was "contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or that the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[60]

A state court decision is contrary to clearly established federal law, as determined by the Supreme Court, when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."[61]

---

[57] See Patterson v. Stewart, 251 F.3d 1243, 1245 (9th Cir. 2001).
[58] See Carey v. Saffold, 536 U.S. 214, 219–20 (2002).
[59] Id. at 223; Trigueros v. Adams, 658 F.3d 983, 988 (9th Cir. 2011).
[60] 28 U.S.C. § 2254(d).
[61] Williams v. Taylor, 529 U.S. 362, 413 (2000).

*Thomas R. Saddler v. Jon Conant*
Case No. 3:14-cv-00105-SLG-DMS                                                          Page 12

Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."[62]

A federal habeas court will review the last reasoned decision of the state court in the proceedings below.[63] Where the last reasoned decision of the state appellate court is based on examining and adopting some of the trial court's reasoning, the trial court ruling is also relevant.[64]

## C. THE PROCEDURAL DEFAULT DOCTRINE DOES NOT BAR FEDERAL HABEAS REVIEW OF THE DOUBLE JEOPARDY CLAIM BECAUSE THE STATE COURT CONSIDERED THE MERITS OF THE FEDERAL QUESTION

In its answer to the petition, respondent contends that Mr. Saddler procedurally defaulted his double jeopardy claim because the Alaska Court of Appeals rejected the claim based on an independent and adequate state procedural rule.[65] This argument mischaracterizes the record, because the Alaska Court of Appeals in fact reviewed the merits of Mr. Saddler's constitutional claim.

To be both "independent" and "adequate," the state court must have actually relied on the state procedural rule to deny relief.[66] The procedural default doctrine does not apply if the last state court rendering a judgment in the case reached the merits of the federal claim.[67]

---

[62] Id.

[63] Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004), quoting Yost v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

[64] Id.

[65] See Coleman v. Thompson, 501 U.S. 722, 729-732, (1991) holding modified by Martinez v. Ryan, 132 S. Ct. 1309 (2012).

[66] Harris v. Reed, 489 U.S. 255, 262 (1989).

[67] Id. See, e.g., Victor v. Nebraska, 511 U.S. 1, 19 (1994) (where Nebraska Supreme Court rejected petitioner's claim on the merits in post-conviction review, claim properly preserved for federal habeas review despite petitioner's failure to preserve the error at trial or raise the issue on direct appeal); Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise be available."); Wainwright v. Witt, 469 U.S. 412, 431 n.11 (1985) ("Under

As the U.S. Supreme Court has stated, "if the state court under state law chooses not to rely on a procedural bar … then there is no basis for a federal habeas court's refusing to consider the merits of the federal claim."[68] Absent an explicit statement that the judgment rests on a state procedural bar, a state court's reference to or even a discussion of its applicability in a given case will not suffice to bar federal habeas review.[69]

In his direct appeal, Mr. Saddler argued that his right against double jeopardy was violated when the trial court reinstated the criminal charges against him, following a mistrial which was declared over the defense objection and in the absence of manifest necessity.[70] The Alaska Court of Appeals initially held that that Mr. Saddler was estopped from challenging the factual sufficiency of the trial court's declaration of a mistrial, on the grounds that his trial attorney invited the alleged error. However, the Court of Appeals went on to consider the merits of the double jeopardy claim and held that Mr. Saddler had not been placed in former jeopardy because the trial court reasonably could have found manifest necessity.[71] Thus, notwithstanding the Court of Appeals' assertion that Mr. Saddler was estopped from raising the claim on appeal, no procedural default occurred because the Court of Appeals

---

circumstances where the state courts do not rely on independent state grounds … and instead reach the merits … the federal question is properly before us."); Cnty. Court of Ulster Cnty., N. Y. v. Allen, 442 U.S. 140, 152 (1979) (no procedural default where prosecution never argued to any state court that procedural default had occurred, trial court ruled on the merits of petitioners' motion, and the New York Court of Appeals did not ignore constitutional claim in its opinion but summarily rejected the claim on its merits); Sangathe v. Maass, 314 F.3d 371, 376-77 (9th Cir. 2002) (federal habeas review available notwithstanding failure to frame the issue in federal constitutional terms in state court because state court "expressly included federal constitutional claims in its ruling"); see also Hertz & Liebman, Federal Habeas Corpus Practice and Procedure, at § 26.2 (6th ed.); Ira P. Robbins, Habeas Corpus Checklists, at § 13:3 (2012 ed.)

[68] Harris, 489 U.S. at 265 n.12.

[69] Harris, 489 U.S. at 258.

[70] Saddler v. State, 2009 WL 793739 (Alaska App. 2009).

[71] Id. at *1 (Alaska App. 2009) ("For the reasons explained here, we conclude that the trial judge did not abuse his discretion when he concluded that it was necessary to discharge the jury and declare a mistrial.")

waived the purported default and considered the merits of the federal question. Mr. Saddler's double jeopardy claim is properly preserved for federal habeas review.

### D. THE COURT OF APPEALS' ADJUDICATION OF THE DOUBLE JEOPARDY CLAIM INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE U.S. SUPREME COURT

#### 1. Background principles

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be "twice put in jeopardy of life or limb." When a criminal defendant is tried by jury, jeopardy attaches once the jury is sworn.[72] This rule is "the linchpin [of] all double jeopardy jurisprudence."[73]

The defendant can relinquish this fundamental right by consenting to a mistrial.[74] But otherwise, the double jeopardy clause protects the defendant from a renewed trial in front of a different jury unless the record establishes that there was a manifest necessity for stopping the initial trial short of verdict.[75] The discretion to discharge the jury prior to verdict is to be exercised "only in very extraordinary and striking circumstances,"[76] and the burden of establishing manifest necessity is a heavy one.[77] Justice Story characterized the burden this way:

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the

---

[72] <u>Crist v. Bretz</u>, 437 U.S. 28, 38 (1978); <u>US. v. Sammaripa</u>, 55 F.3d 433, 434 (9th Cir.1995).
[73] <u>Id.</u>
[74] <u>Arizona v. Washington</u>, 434 U.S. 497, 505 (1978).
[75] <u>Id.</u>
[76] <u>U.S. v. Coolidge</u>, 25 Fed. Cas. 622, 623 (1815).
[77] <u>Washington</u>, 434 U.S. at 505.

power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes…

U.S. v. Perez, 22 U.S. 579 (1824).

Applying the Perez standard, the U.S. Supreme Court has held that the degree of discretion varies depending on the circumstances. On the one hand, a deadlocked jury has long been considered the "classic basis" establishing necessity for declaring a mistrial. Accordingly, when a trial judge declares a mistrial because he considers the jury deadlocked, that decision is accorded great deference by a reviewing court.[78] This deference rests on the presumption that the trial court is in the best position to assess all the factors which must be considered in making the determination that the jury cannot reach a just verdict if deliberations continue.[79]

On the other hand, the strictest scrutiny is reserved for instances where a mistrial is declared on the basis of unavailable but critical prosecution evidence, or when there is reason to believe that the prosecutor is attempting to subvert the one-trial rule to gain a tactical advantage over the defense.[80] The Court has held that, for example, when a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred."[81]

Discretion is not absolute. If the record reveals that the trial judge has failed to exercise the sound discretion entrusted to him, the reason for such deference by an appellate court disappears.[82] Thus, if the trial judge acts for reasons "completely unrelated" to the trial

---

[78] Id. at 508 n. 28 (citing cases). Similarly, a trial judge's declaration of a mistrial based on juror prejudice or bias "is entitled to special respect." Id. at 510.
[79] Id.
[80] Washington, 434 U.S. at 508 n. 24 (citing Downum v. U.S., 372 U.S 734, 736, (1963)).
[81] Downum, 372 U.S. at 736.
[82] Renico v. Lett, 559 U.S. 766, 775 (2010) (citing Washington, 434 U.S. at 508 n. 28).

problems which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate.[83]

## 2. Because it substituted its own reasoning for that of the trial court, the Alaska Court of Appeals unreasonably failed to apply the correct standard of review in determining whether the mistrial was supported by manifest necessity

The present case involves three interwoven orders issued by the trial court. Initially, the trial court declared a mistrial without any discussion of the constitutional standard, and did so following a truncated discussion with the jurors concerning their availability if the trial was continued for 45 days. In its Order dated November 14, 2005, the trial court, after reflection, determined that the mistrial had been improvidently ordered.[84] In this second order, the trial court identified the correct legal principle – manifest necessity – and acknowledged that, because the court had failed to poll the jurors, the declaration of a mistrial was not factually sound:

> There is no indication in the record as to why the five jurors in question would not have been available on the newly set trial date, nor did the court inquire to confirm that they in fact would suffer a sufficiently substantial hardship that they would have to be excused on that new date. By failing to file an opposition, the state concedes that the court should have engaged in this inquiry and that having failed to make this inquiry, the court had an inadequate record on which to find that it was manifestly necessary to declare a mistrial.[85]

These findings by the trial court were not clearly erroneous, and the underlying legal premise was sound.[86] Moreover, when it reinstated the charges against Mr. Saddler, the

---

[83] Id.

[84] Exhibit B at 15. ("The court will take the state's failure to oppose as a concession that the court should have polled the jury regarding juror availability and will find that concession well taken.")

[85] Exhibit B at 20.

[86] As the Court of Appeals acknowledged, the unavailability of jurors does not necessarily constitute manifest necessity. See, e.g., Cohens v. Ewell, 600 Sp.2d 1224 (Fla. App. 1992) ("We are hesitant to conclude, however, that the potential inconveniences to the two jurors rendered them legitimately unavailable and created a manifest necessity for a mistrial. Further … [the trial judge] did not actively explore his other options before discharging the jury."); People v. Michael,

court did not revisit these findings.[87] Instead, the trial court judge rescinded his mistrial order and held that a new trial was warranted under Alaska Rule of Criminal Procedure 27(d). By declaring that there had never been a mistrial in the first place, the trial court thus attempted to avoid the double jeopardy implications of reinstating the prosecution against Mr. Saddler.[88]

In Friedmann v. State, an appeal brought by Mr. Saddler's codefendant, the Alaska Court of Appeals flatly rejected this ruling. In a published opinion, the court (correctly) held that, even if the trial court's order was construed as a discharge of the jury pursuant to Rule 27(d)(3), the order functioned as a declaration of a mistrial and therefore had to be supported by manifest necessity to survive constitutional scrutiny.[89] However, the court found that counsel for Mr. Friedmann had consented to the mistrial, waiving the issue.[90]

When it came time to consider the present case, the Court of Appeals chose not to dwell on the inconvenient fact that the trial court had found the declaration of the mistrial factually unjustified, or that the trial judge had relied on an incorrect legal theory when he reinstated the charges. Instead, the Court of Appeals held that, notwithstanding the trial judge's own ruling, the declaration of a mistrial *was* supported by manifest necessity. In so doing, the Court of Appeals was forced to create new facts in support of the mistrial order

---

394 N.E. 2d 1134 (NY 1979) ("Nonetheless, a mistrial founded solely upon the convenience of the court and the jury is certainly not manifestly necessary… Rather than considering this alternative seriously, the court *sua sponte* and unfortunately declared a mistrial. That decision constituted an abuse of discretion.")

[87] Exhibit B at 60-61. ("As the court noted in its earlier order, the court probably should have inquired of the jurors before concluding that they were not available.")

[88] The Court of Appeals framed it this way: "In accord with this view of matters, Judge Smith retroactively rescinded his declaration of a mistrial and instead declared that the jury had been discharged under the authority of Criminal Rule 27(d)(3). He then calendared a second trial for the three defendants." Friedmann v. State, 172 P.3d 831, 835 (Alaska App. 2007).

[89] 172 P.3d at 836 (Alaska App. 2007). See also Lee v. U.S., 432 U.S. 23, 31 (1977) (holding that trial court's order of dismissal was "functionally indistinguishable from a declaration of a mistrial.")

[90] Friedmann, 172 P.3d at 837.

and imputed to the trial court a reasoned decision which the trial court did not make (and expressly rejected).

In essence, the Court of Appeals salvaged the trial court's poorly-reasoned declaration of a mistrial by concluding that a continuance in this case was inadequate for three reasons: (1) the problems inherent in keeping the jury "safeguarded from extraneous information and influences" for at least 45 days; (2) managing the four attorneys' calendars and those of the various trial witnesses; (3) the possibility that the defendants would seek to sever the charges.

The problem is that *none* of these factors was ever identified or referenced by the trial court when it declared the mistrial or in its ensuing order. There was zero consideration by the trial court about the supposed risks of exposing the jury to "outside influences." Indeed, because the need for a continuance arose before evidence had been even begun, there would was no reasonable basis for fearing that the jurors' memories of the evidence would fade or become tainted during the intervening period. Nor does the record support the assertion that Mr. Saddler's was the kind of highly publicized case in which the jurors were likely to be exposed to prejudicial publicity (a critical fact which distinguished many of the cases which the Court of Appeals cited in its opinion).[91]

It is also telling that the prosecutor did not object when the subject of a continuance was raised. Nor did the prosecutor raise any concerns about the logistics of continuing a trial based on the schedules of the state's witnesses.

As to the theory that the defendants would have moved for severance of the trials if the matter was continued, this, too, is speculation given that none of the defendants advocated for a severance of the trials. When the attorney for Mr. Friedmann – the only defendant who did not have reason to seek a continuance – weighed in on the matter, he expressed

---

[91] See U.S. v. Williams, 717 F.2d 473 (9th Cir. 1983) (holding that a lengthy continuance was inadequate as a substitute for a mistrial because "[a]dditionally there existed a substantial risk of juror prejudice resulting from the extensive media coverage of the case.")

little preference for which remedy the trial court settled on.[92] The discussion by the Court of Appeals on these points is not grounded in a plausible reading of the record.[93]

The cognitive dissonance between the Court of Appeals' reasoning and that of the trial court becomes apparent in the later sections of the opinion, in which the Court frames its inquiry in terms of hypothetical questions which the trial court could (but failed) to consider:

"Another factor that Judge Smith <u>could</u> reasonably consider…"

"…a lengthy continuance <u>might</u> require severance of the defendant's trials…"

"…any attempt to promptly reconvene the trial <u>would</u> almost inevitably be hindered by the fact that four different attorneys' schedules would have to be accommodated…"

"Judge Smith <u>could</u> reasonably conclude that it was necessary to discharge the jurors and start again at a later time..."

A trial court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.[94] Here, none of the reasons identified by the Court of Appeals in affirming the mistrial order were actually identified by the trial court. Some of the "facts" identified by the Court of Appeals do not appear in the record at all. In reviewing for abuse of discretion, the Court of Appeals was not entitled to overlook the court's flawed legal reasoning or hypothesize about the possible rationales

---

[92] Tr. 133-134.

[93] A state appellate court's purported findings of fact which are made without evidentiary basis are not entitled to the presumption of correctness under 28 USC § 2254(e)(1). <u>See</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 527-531 (2003) (no presumption of correctness to state findings which were based on a "clear factual error" regarding contents of social services records that were in counsel's possession).

[94] <u>Koon v. U.S.</u>, 518 U.S. 81, 100 (1996) (citing <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 405 (1990)).

the trial court could have relied on. As one Circuit Court has held, "Although findings of fact or a statement of the trial court's reasons for the declaration of a mistrial are not constitutionally mandated, the failure of the record to provide adequate support for the trial judge's action may bar a retrial. *It is not enough that plausible reasons might conceivably exist for the trial judge's action.*"[95] This is because the discretion to order a mistrial rests with the trial court, not the reviewing tribunal.[96]

As the Supreme Court has repeatedly stated, the <u>Perez</u> doctrine of manifest necessity obligates the trial court to refrain from declaring a mistrial unless a "scrupulous exercise" of *its* judicial discretion leads to the conclusion that continuation of the trial is not in the public interest.[97] This constitutional command is meaningless if the trial court is free to grant a mistrial without the requisite factual findings and leave the matter to a reviewing court to reconstruct on appeal. For this reason, the job of the reviewing court is to determine if the record supports the trial judge's actual, as opposed to hypothetical, reason in declaring the mistrial.[98]

Consider, as but one example, <u>Dunkerly v. Hogan</u>.[99] In that case, the defendant was prosecuted for murder. The jury was under sequester. On the third day of trial, the defendant fell ill with a collapsed lung that required hospitalization for at least seven to ten

---

[95] <u>Dunkerley v. Hogan</u>, 579 F.2d 141, 146 (2d Cir. 1978), cert. denied, 439 U.S. 1090 (1979) (internal quotation marks omitted) (emphasis added).

[96] <u>U.S. v. Sanders</u>, 591 F.2d 1293, 1299 (9th Cir. 1979) ("[E]ven when the judge explains his or her reasons for declaring a mistrial, the record must support the explicit or implicit finding of manifest necessity … When the record is barren of reasons for the mistrial, or discloses that the judge's assumptions regarding jury deadlock or juror bias were unfounded, or reveals that the judge failed adequately to consider feasible alternatives to a mistrial, then the decision to declare a mistrial may be reversed by a reviewing court.") (internal quotation marks omitted) (citations omitted).

[97] <u>U.S. v. Jorn</u>, 400 U.S. 470, 486 ("[T]he trial judge must still take care to assure *himself* that the situation warrants action on his part…"); <u>Washington</u>, 434 U.S. at 514 ("If a trial judge acts irrationally or irresponsibly, his action cannot be condoned.").

[98] <u>Washington</u>, 434 U.S. at 517.

[99] 579 F.2d 141, 142 (2nd Cir. 1978).

days.[100] The trial court asked for input from the parties about whether he should declare a mistrial.[101] The defense objected and informed the trial judge that the defense would move to dismiss any re-prosecution on double jeopardy grounds. The defense proposed either moving forward with the trial in the defendant's absence or, in the alternative, de-sequestering the jury and continuing the trial until the defendant recovered. Following a ten minute recess, the trial judge declared a mistrial, stating only that he found doing so was required "in the interests of justice."[102] The trial judge failed to discuss why a continuance would not have been feasible or otherwise impractical.

The defendant sought habeas relief with the federal district court, which was denied. On appeal, the Second Circuit Court of Appeals reversed. The Second Circuit noted that the record failed to establish that the proposed alternative, a continuance, was impractical.[103] The court was also unimpressed with the argument that a continuance would have risked exposing the jury to prejudicial publicity, given that "the record is silent as to whether the case received any publicity at all."[104] As in the present case, the prosecutor had not objected to the proposed continuance, and had failed to present any arguments indicating that a continuance would work undue hardship on the court, jury, counsel or the prosecutor. On the record before it, the Second Circuit found that a mistrial could not be sustained.

Here, as in Dunkerly, the Court of Appeals was not entitled on review to create new facts or speculate about the grounds that the trial court could have relied on when it declared the mistrial in the first instance.[105] The trial court held that manifest necessity did not exist, and then reinstated the criminal charges anyway based on a plainly erroneous legal theory.

---

[100] Id. at 143.
[101] Id.
[102] Id. at 144.
[103] Id. at 148.
[104] Id. at 147.
[105] Renico v. Lett, 559 U.S. 766, 795 (2010) (Stevens, J., dissenting) ("Although the trial judge's decision is entitled to great deference, it is not the place of a reviewing court to extract factoids from the record in an attempt to salvage a bad decision.") (quoting from decision below).

If these actions did not represent a clear abuse of discretion, it's hard to imagine a case which does.

### 3. The Alaska Court of Appeals unreasonably applied clearly-established Supreme Court case law when it held that the mistrial in this case was supported by manifest necessity

#### a. The Court of Appeals unreasonably defined manifest necessity

It is important to note that Thomas Saddler's trial was not terminated prematurely because of a deadlocked jury, the "classic basis" for declaring a mistrial, which calls for "great deference" by the reviewing court.[106] Nor did the trial court declare a mistrial based on the risk of prejudice to the jury because of improperly admitted evidence, another "special" situation which is uniquely within a trial judge's province.[107] Nor was the trial judge compelled to order a mistrial because of an obvious procedural error, such as a defect in the indictment, which meant that any conviction was certain to be reversed on appeal.[108] Rather, the trial judge was presented with a fairly straight-forward discovery violation which called for a continuance. Given that such things happen in busy courtrooms across the country, it would be absurd to suggest that such a situation automatically warrants terminating trial altogether.

Nonetheless, in its opinion affirming Saddler's conviction, the Court of Appeals made the bizarre claim that "[m]any courts have concluded that mid-trial continuances of lengthy

---

[106] Washington, 434 U.S. at 505.

[107] See Hernandez v. New York, 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'Peculiarly within a trial judge's province.'") (citations omitted); U.S. v. Sanders, 591 F.2d 1293, 1299 (9th Cir.1979).

[108] Somerville, 410 U.S. at 464 ("If an error would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.").

and uncertain duration will, *of themselves*, provide a constitutionally adequate necessity for a mistrial."[109]

This passage is disturbing, not only because it's an inaccurate summary of the existing case law, but also because it clearly misstates the governing constitutional principles. A lengthy continuance of unknown duration *may*, under certain circumstances, help support a trial court's declaration of a mistrial, but it is incorrect to assert, as the Court of Appeals did, that a lengthy continuance and nothing more, will give rise to manifest necessity. As the U.S. Supreme Court has held repeatedly, the <u>Perez</u> doctrine "forbids the mechanical application of any abstract formula," given the "the varying and often unique situations" which arise during criminal trials.[110] Contrary to the Court of Appeals' assertion, a lengthy continuance does not invariably justify a mistrial, and any case supposedly saying otherwise is in direct conflict with the Fifth Amendment. By framing the issue in such absolute terms, the Court of Appeals signaled its departure from clearly-established U.S. Supreme Court precedent, which rejects any rigid rules of thumb and commands that the trial court "take all the circumstances into account" before declaring a mistrial.[111]

It suffices to say that none of the cases cited by the Court of Appeals stand for the misleading proposition that a defendant's request for a lengthy continuance will *ipso facto* justify a mistrial. Each case cited by the Court of Appeals is either readily distinguishable or involved circumstances far more compelling than the case at hand.[112]

---

[109] <u>Saddler</u>, 2009 WL 793739, at *5.

[110] <u>Illinois v. Somerville</u>, 410 U.S. at 462.

[111] <u>Wade v. Hunter</u>, 336 U.S. 684, 691 (1949); <u>Jorn</u>, 400 U.S. at 480. See also <u>U.S. v. Bates</u>, 917 F.3d 388, 394 (9th Cir. 1990) ("Just as Justice Story found it impossible to describe all the circumstances that would constitute manifest necessity, courts steadfastly continue to refuse to categorize fact patterns that constitute manifest necessity and fact patterns that do not.")

[112] For example, in <u>U.S. v. Peng</u>, 766 F.2d 82, 85-87 (2d Cir. 1985), the Second Circuit affirmed the grant of a mistrial based on the mid-trial revelation that the defense attorney was himself a witness in the case and would likely to have to testify to properly admit certain statements which he had referenced during opening remarks to the jury. After the defense attorney was disqualified, the court ordered a new trial. Although the court had been concerned that new counsel would need a continuance to prepare, prejudice to the jury was the "foremost" reason a mistrial was declared.

Indeed, there is an equally compelling body of law which stands for the contrary premise –cases in which trial judges, suddenly faced with a situation that calls for a lengthy or uncertain mid-trial continuance, have instead continued the trial proceedings rather than abort the trial altogether, and been upheld on review.[113]

Take, for example, State v. Bonner, in which the defendant was facing felony controlled substance charges.[114] After jury selection and after the state had presented its first witness, the defense attorneys became aware of an ethical conflict that required them to withdraw as counsel. The trial was continued for 55 days. The trial judge admonished the jurors not to read about any news reports concerning the case, or discuss the case amongst themselves or with others. When trial resumed, the trial judge inquired of the jurors whether they had been exposed to any news reports about the case, or radio reports or otherwise communicated with others about the case. The jurors responded in the negative. The new

Similarly, in MacArthur v. Bank of New York, 524 F. Supp. 1205, 1207-08 (S.D.N.Y. 1981), a mistrial was ordered when it became apparent that attorneys representing the defendant in a civil action would be called to testify and thus were disqualified from continuing as defense counsel. In addition to the need for a continuance, the trial court, concerned that the jury could "conceivably speculate" as to the reason counsel had been changed in the middle of trial, properly exercised its discretion in ordering a mistrial. In Rasmussen v. White, 502 F. Supp. 237, 240 (E.D. Tex. 1980), the federal district court *declined* to review the habeas corpus petition filed by a state defendant arguing that his impending trial violated double jeopardy. Finding that it was precluded from considering the double jeopardy question under the abstention doctrine of Younger v. Harris, 401 U.S. 37 (1971), the federal court dismissed the petition, although in *dicta* the court noted in passing that the mistrial was warranted based on the trial court's ruling that a continuance was not "feasible." The factual underpinnings for the trial court's ruling were not disclosed in the opinion.
[113] See, e.g., Williams v. State, 268 S.W.3d 868 (Ark. 2007) (holding that in rape prosecution, trial court did not abuse its discretion when, shortly after jury selection and before presentation of evidence, it continued trial to allow prosecution to obtain forensic testing of rape kit, and then declared mistrial *sua sponte* when the lab results had not been completed four months later; trial judge's decision was motivated out of concern that the jury's service was nearing its end and that jury had been tainted by the delay and could no longer be fair and impartial); Packwood v. State, 193 N.E.2d 494, 496 (Indiana 1963) (holding that, in kidnaping prosecution, trial court did not abuse its discretion in ordering 39-day continuance prompted by trial judge's unavailability, despite the risk of jury exposure to news accounts about the trial published during the interim period). See generally, "Separation of jury in criminal case during trial—modern cases," 72 A.L.R. 3d 131.
[114] 361 NW 2d 605 (North Dakota 1985).

defense attorneys sought a mistrial, which was denied, and trial resumed. The Supreme Court of North Dakota affirmed, holding that the defense had consented to the continuance, and given the court's admonishments and the lack of prejudice to the defense caused by the delay, the trial court had not abused its discretion.[115]

Whether a mistrial is appropriate depends on a consideration of all the circumstances. And as previously stated, a request for a mid-trial continuance of uncertain or lengthy duration may, in certain cases, support the need for a mistrial. But cases like <u>Bonner</u> (which was specifically cited by Saddler on appeal) expose how wrongheaded the Court of Appeals' analysis was.

As discussed in section 2, *supra*, the Court of Appeals identified three factors which in its estimation made the circumstances so compelling that a mistrial was necessary: the problems of keeping the jurors available at the conclusion of the 45-day continuance, the complexities of getting the various trial participants to agree on a new trial date, and the possible risk that the defendants would seek a severance.

Even assuming that the trial court had actually identified these factors in ordering a mistrial, the declaration of a mistrial would still be indefensible. No Supreme Court decision has held that a trial court has greater discretion to order a mistrial when the alternative remedy requires the court to use a scheduling planner.[116] As the Supreme Court has observed, "a criminal trial is, even in the best of circumstances, a complicated affair to manage."[117]

---

[115] 361 N.W.2d 605, 612 (N.D. 1985) ("Considering the totality of circumstances, we cannot say that Bonner has demonstrated the existence of prejudice in law or fact on this issue. The trial court was acting within its discretion when it proceeded to trial with the same jury.")

[116] Witness conflicts and scheduling issues have been given low consideration in the Supreme Court's double jeopardy jurisprudence. In <u>Downum</u>, for example, the Court held that the retrial of the defendant on multiple charges of passing fraudulent checks, which involved approximately 100 witnesses, was barred by double jeopardy, where the prosecution obtained a mistrial based on the unavailability of a single witness whom the prosecution had failed to locate prior to the first trial. 372 U.S 734, 736, (1963).

[117] <u>Jorn</u>, 400 U.S. at 479.

The Court of Appeals' suggestion that a mid-trial continuance invariably warrants a mistrial is inaccurate and trivializes the seriousness of a remedy which should be used with the "greatest caution," under urgent circumstances, and for very "plain and obvious causes."[118] Simply put, the defense's need for a continuance, even when one considers the complexities of managing a trial with co-defendants, did not present the kind of intractable dilemma which required stepping on the toes of the Fifth Amendment's double jeopardy clause, which safeguards the defendant's "valued right to have his trial completed by a particular tribunal."[119]

> **b. The Court of Appeals unreasonably applied clearly-established Supreme Court authority which requires the trial court to seriously consider less-drastic alternatives short of a mistrial**

In cases where a mistrial is declared for reasons other than a deadlocked jury, the Supreme Court has made it clear that a trial court must act deliberately and consider less drastic alternatives. A trial court's failure to do so may preclude findings of manifest necessity.

For example, in U.S. v. Jorn the trial court declared a mistrial in what the Supreme Court characterized as an overzealous attempt to safeguard the prosecution witnesses' privilege against self-incrimination. The Supreme Court concluded that the mistrial was not supported by manifest necessity, and characterized the trial judge's actions as "abrupt," noting that he cut off the prosecutor in midstream and discharged the jury without giving the parties an opportunity to suggest the alternative of a continuance or even to object before the jury was discharged.[120]

And in Arizona v. Washington, another case which did not involve a deadlocked jury, the Court was asked to consider the propriety of a mistrial where the trial court neglected to

---

[118] Perez, 22 U.S. 579 (1824).
[119] Jorn, 400 U.S. at 484.
[120] 400 U.S., at 487 (plurality opinion); see also Somerville, 410 U.S., at 469 (characterizing Jorn judge's actions as "erratic").

make an explicit finding of manifest necessity.[121] Although the Court held that such findings were not required, the Court held that, to survive review, the record had to provide a sufficient justification for the mistrial ruling. The Court was satisfied that there had been no abuse of discretion, as the record sufficiently established that the trial court, after hearing arguments over the course of two days, adequately considered the alternatives, "evinced a concern for the possible double jeopardy consequences of an erroneous ruling" and "accorded careful consideration to the defendant's interest in having the trial concluded in a single proceeding."[122]

A search of the case law reveals many, many cases where the reviewing courts, applying Jorn and Washington, have overturned a trial court's hasty declaration of a mistrial because, as in the present case, the trial court failed to deliberate prior to its decision and failed to thoroughly consider the merits of an alternative less drastic than a mistrial.[123] For example, in Johnson v. Karnes, an AEDPA habeas case, an Ohio state trial court judge ordered a mistrial over the defendant's objection, based on the admission of improper testimony.[124] Prior to retrial, the defendant pursued habeas relief, which was denied by the

---

[121] 434 U.S. 497, 516 (1978).

[122] Id.

[123] See, e.g., Walck v. Edmondson, 472 F.3d 1227 (10th Cir.2007) (in petition for writ of habeas corpus under 28 USC § 2241, no manifest necessity to justify mistrial where prosecution witness became unavailable due to Caesarean section and trial court failed to consider "viable and reasonable alternatives" before declaring mistrial); U.S. v. Rivera, 384 F.3d 49 (3rd Cir. 2004) (no manifest necessity when mistrial rather than continuance declared for unavailable witness; court failed to consider both the constitutional implications attendant to the declaration of a mistrial, as well as the reasonable alternatives to a mistrial); U.S. v. Smith, 621 F.2d 350, 351 (9th Cir. 1980) (mistrial improper where a juror's 87 year-old mother had suffered a stroke and the juror declared herself unable to come to court; because the record gave "no indication that the court here even considered the possibility of a continuance before ordering a mistrial," manifest necessity not found); U.S. v. McKoy, 591 F.2d 218, 222-23 (3d Cir. 1979) (no manifest necessity to justify mistrial, as opposed to a continuance, based on trial court's concerns that defense counsel was a possible witness to the case); U.S. v. Cheung, 485 F.2d 689, 691 (5th Cir. 1973) (no manifest necessity to declare a mistrial where difficulties arose in translating non-English speaking witness's testimony; trial court failed to consider less drastic solutions short of a mistrial); See generally, "Separation of jury in criminal case during trial—modern cases," 72 A.L.R.3d 131.

[124] 198 F.3d 589 (6th Cir.1999).

federal district court. On review, the 6th Circuit held that the trial court judge had had failed to seriously consider reasonable alternatives or bothered to consider the negative consequences a mistrial would have on the defendant's double jeopardy rights.[125] Finding that the state court had unreasonably applied clearly-established Supreme Court precedent in failing to dismiss the case, the 6th Circuit granted the petition.

In the present case, the trial court did not weigh the competing interests in terminating the trial, seriously consider alternatives, or even identify the applicable legal principle. This presents a scenario very unlike the one discussed in Washington, and falls much closer to the erratic grant of a mistrial which the Supreme Court condemned in Jorn. Nonetheless, these clear and obvious parallels were unreasonably ignored by the Court of Appeals when it rendered its decision in Mr. Saddler's case.[126]

### c. The Court of Appeals unreasonably failed to consider the prejudice to Saddler

The Fifth Amendment's double jeopardy clause is grounded in principles of basic fairness. "The underlying idea ... is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."[127]

---

[125] Id.
[126] Cf. Washington, 434 U.S. at 525 (Marshall, J., dissenting) (manifest necessity requires showing "that there were no meaningful and practical alternatives to a mistrial, or that the trial court scrupulously considered available alternatives and found all wanting but a termination of the proceedings").
[127] Green v. United States, 355 U.S. 184, 187–188 (1957).

When a trial is discontinued short of a verdict, there is a risk that a second prosecution "may be grossly unfair," to the extent it operates as "a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case."[128]

In examining Thomas Saddler's double jeopardy claim, the Court of Appeals did not remark upon this crucial facet of the trial judge's order. There is ample evidence, however, that the mistrial likely worked to Mr. Saddler's disadvantage. Although opening statements had not yet begun, the court had heard pretrial motions concerning the admissibility of prior misconduct evidence which the state claimed was essential to proving Mr. Saddler's intent and knowledge of the offense. Following an evidentiary hearing, the trial court sustained the defendant's motion to exclude this evidence, finding that although the proffered evidence was probative of Saddler's intent under Alaska Rule of Evidence 401, it was more prejudicial than probative under Evidence Rule 403.[129]

Whether or not the trial court would have stood by this ruling on retrial remains unknown, but the prosecutor would have had an opportunity during the time between trials to find additional argument for his position, re-brief it with new authority, secure the witnesses needed to lay the proper foundation for admission of the evidence, and raise his modified argument when retrial commenced.**[130]** The failure of both the trial court and the Court of Appeals to acknowledge this concern speaks to the unreasonableness of their respective decisions.[131]

---

[128] Somerville, 410 U.S. at 469.

[129] Tr. 109.

[130] See Priest v. Lindig, 591 P.2d 1299 (Alaska 1979) (court has discretion on retrial to choose whether to adopt and utilize pretrial proceedings that took place prior to the first trial).

[131] See Cheung, 485 F.2d at 692 (where mistrial declared after prosecutor's witness had testified and offered exculpatory evidence concerning one of two codefendants and incriminated the other, trial judge abused his discretion in ordering a mistrial, and should have realized that the government would have a new opportunity at the retrial to seek a severance and call the witness only in the trial of the defendant he incriminated).

### d. Counsel for Saddler did not consent, expressly or impliedly, to the trial court's declaration of a mistrial

A declaration of a mistrial must be supported by manifest necessity, in the absence of either an affirmative request for a mistrial or consent by the defendant.[132] Whether or not a defendant consented to a mistrial is a legal question,[133] and treated differently from a mere failure to preserve error. The Supreme Court has never held that a defendant must object to a trial court's *sua sponte* declaration of a mistrial in order to preserve a claim of former jeopardy.[134]

In its opinion, the Court of Appeals engaged in a lengthy discussion of invited error and whether Saddler was estopped from raising his argument. The Court of Appeals also placed great significance on the trial court's passing remark, made before the jurors returned to the courtroom, that he would be asking the jurors about their availability in 45 days' time.[135] However, the Court was forced to acknowledge that Saddler's attorney had indeed "adamantly refused to consent to a mistrial."[136] The record establishes that the Court of Appeals was correct on this score. Trial counsel made it abundantly clear that he would not be consenting to a mistrial when the trial court first floated the idea. As the discussion progressed, counsel for Mr. Saddler repeatedly alerted the court to the double jeopardy problems that would follow if the court *sua sponte* declared a mistrial.[137] Trial counsel agreed to a continuance, nothing more, and the trial court's insistence on declaring a

---

[132] <u>Jorn</u>, 400 U.S. at 485 ("[A] motion by the defendant for mistrial is ordinarily assumed to remove any barrier to re-prosecution") (plurality opinion).

[133] <u>See</u> <u>Toribio-Lugo</u>, 376 F.3d 33, 38 (1st Cir. 2004) ("Whether the facts as found add up to consent is a legal determination that we review *de novo*."); <u>U.S. v. Lara-Ramirez</u>, 519 F.3d 76, 83 (1st Cir. 2008).

[134] <u>Renico v. Lett</u>, 559 U.S. at 795 n. 17 (2010) (Stevens, J., dissenting).

[135] Tr. 164.

[136] <u>Saddler v. State</u>, No. 5456, 2009 WL 793739, at *4 (Alaska App. Mar. 25, 2009)

[137] Tr. 118 ("Well, if that were to happen, Judge, I would come right back in here and make a double jeopardy argument. Because I'm not asking for a mistrial, I'm asking for an exclusion...") and Tr. 125 ("...But what I will say is if the defense doesn't ask for a mistrial and the court grants a mistrial because you think that's the adequate remedy, I think my client's got a double jeopardy issue.").

Case 3:14-cv-00105-SLG-DMS   Document 23   Filed 02/05/15   Page 31 of 40

mistrial should not be imputed to the defense. Further, the fact that the trial court's own order discusses the existence of manifest necessity further illustrates that the trial court understood Saddler to have objected to the mistrial.

Nor is the record adequate to support the conclusion that trial counsel impliedly consented to the mistrial. Federal courts have held on occasion that consent to a mistrial may be implied from a defendant's acts or failures to act."[138] However, such an "implication of consent is not lightly to be indulged."[139] Here, the defense attorney, far from sitting silently, clearly notified the court that he objected to the court's mistrial proposal and specifically identified the constitutional principle at issue. [140] Counsel for Saddler also promptly raised the objection in a post-trial motion.

In addition, a review of the audio recording further establishes that the declaration of the mistrial was made suddenly and abruptly after the jurors returned. Starting from the moment the jurors were seated, it took the judge *less than a minute* to declare a mistrial. After the jurors were polled, the judge waited mere seconds before excusing them.[141] It was the burden of the court, on its own motion, to establish manifest necessity if it was choosing to do so over the defense objection.[142] On this record, no consent can be found and stating otherwise is unreasonable.

---

[138] <u>Toribio-Lugo</u>, 376 F.3d at 40.

[139] <u>Id.</u>

[140] <u>U.S. v. Lara-Ramirez</u>, 519 F.3d 76, 83 (1st Cir. 2008) (holding that, despite failure of trial counsel to state he was objecting in the aftermath of the declaration of a mistrial, no implied consent where "the actions of the defense counsel belied any suggestion of consent.")

[141] <u>See Jorn</u>, 400 U.S. 470, 487 (1971) (plurality opinion) (no consent where no opportunity to object to *sua sponte* mistrial); <u>Gori v. United States</u>, 367 U.S. 364, 365 n. 6 (1961) (noting in *dicta* petitioner's argument that there was no opportunity to object "because of the precipitous course of events"); <u>U.S. v. Bates</u>, 917 F.2d 388, 393 (9th Cir. 1990) ("Bates and Archer had no opportunity to object, we will not infer that they consented to the mistrial").

[142] <u>Washington</u>, 434 U.S. at 505 (1978).

## E. THE ALASKA COURT OF APPEALS' DECISION ADJUDICATING SADDLER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL WAS CONTRARY TO, AND UNREASONABLY APPLIED CLEARLY ESTABLISHED U.S. SUPREME COURT PRECEDENT

A claim of ineffective assistance of counsel has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency resulted in prejudice to the defense.[143] To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."[144] In Hill v. Lockhart, the Supreme Court held that to establish prejudice under Strickland, a petitioner alleging ineffective assistance of counsel during plea negotiations must show "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[145] Whether or not counsel's performance was constitutionally ineffective is a mixed question of law and fact which is not entitled to the statutory presumption of correctness under 28 USC 2254(e)(1).[146]

In his *pro se* application for post-conviction relief as well as the ensuing evidentiary hearing, Saddler passionately argued that his plea had been the product of incompetent legal advice by his attorney. Among other things, he asserted that, based on his attorney's advice, he believed that he was certain to win on appeal, and that pursuing a direct appeal following the Cooksey plea was the fastest way to get out of jail.[147] He also asserted that at the time he entered his plea, his attorney had incorrectly advised him that he could not seek interlocutory review of the double jeopardy claim.[148] Although there were significant

---

[143] Strickland v. Washington, 466 U.S. 668, 687 (1984).
[144] Id. at 688.
[145] 474 U.S. 52, 59 (1985); see also U.S. v. Nahodil, 36 F.3d 323, 326 (3d Cir.1994).
[146] Thompson v. Keohane, 516 U.S. 99, 109-113 (1995); Strickland, 466 U.S. at 698.
[147] Exhibit D at 56.
[148] Exhibit D at 52-53 ("Defense counsel said we could not do a interlocutory review, or an appeal until final judgement on our double jeopardy issue was completed, the lawyers reasoning was, if we did this now and the court of appeals denied our review we would not be able to challenge our double jeopary issue in the appeals court. I beleave this was the attroneys way of manipulation and coercing the defendant into changing his plea from not guilty to no contest along with saying "we got this case beat hands down," or this lawyer did not know the facts of law. Tritt v state 134 P3d

disagreements in the testimony given by Saddler and his attorney, this claim was never called into question. Saddler's former counsel admitted that he believed the Cooksey plea to be Saddler's "best and only" option for seeking appellate review of the double jeopardy claim. He professed ignorance about many aspects of the appellate process.

However, both the Superior Court and the Court of Appeals on review unreasonably failed to confront this issue, owing to the incorrect assumption that Saddler could not have been prejudiced by trial counsel's lawyering, insofar as trial counsel reasonably concluded that Saddler's prospects at trial were poor.[149] This reasoning, however, fails to comport with clearly-established Supreme Court precedent going as far back as Lockhart. Regardless of the outcome, Saddler was entitled to a fair trial.[150] Saddler established that he would not have forfeited his trial rights and accepted the Cooksey plea if counsel had competently advised him of his right to interlocutory review of the double jeopardy claim. Moreover, because he remained ignorant of his right to interlocutory review, Saddler was forced to accept the steep concessions demanded by the prosecutor during plea negotiations. Accordingly, he was (and is) entitled to relief on his claim of ineffective assistance of counsel.

1. **Trial counsel was ineffective when he failed to advise Saddler of his right to immediately appeal the court's decision reinstating the charges**

It is well-established that a criminal defendant has the ultimate authority to make certain fundamental decisions regarding his case, such as whether to plead guilty, waive his right

---

364, or Artemie v state, not published states that the appellate court should deside the merits of the double jeopardy claim though no final judgment has been entered.")

[149] Exhibit D at 10 ("Mr. Saddler has not demonstrated that he was prejudiced in any manner … [a]s such, had Mr. Saddler gone to trial, rather than taking the deal that was offered, he most likely would have ended up in a much worse position, given the number of Class A felony charges he faced.")

[150] Kimmelman v. Morrison, 477 US 365, 379 (1986).

to a jury trial, testify in his or her own behalf, or – especially germane in this case – take an appeal.[151]

In <u>Roe v. Flores-Ortega</u>, the U.S. Supreme Court held that an attorney is constitutionally ineffective if he fails to consult with a defendant about an appeal, when there is either (1) a reasonable belief that there are non-frivolous grounds for appeal, or (2) because the client has demonstrated an interest in appeal.[152]

The record establishes that, despite his client's eagerness to seek appellate review of the double jeopardy claim, Saddler's attorney either ignored or failed to advise his client of his right to pursue an interlocutory appeal of the trial court's order reinstating the criminal charges.

The right to interlocutory review of such claims is rooted in the "special considerations" unique to assertions of former jeopardy.[153] As the U.S. Supreme Court has acknowledged, the Fifth Amendment's double jeopardy clause is not a prohibition against being twice punished, but against being twice "put in jeopardy." Consequently, if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the clause, his double jeopardy challenge to a reinstated criminal charge must be reviewable before that subsequent exposure (i.e., trial, conviction and sentence) occurs.[154] Similarly, the Alaska Supreme Court has held that when a trial judge denies a defendant's motion to

---

[151] <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983) ("It is ... recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 93 n. 1 (1977) (Burger, C.J., concurring).
[152] <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 480 (2000).
[153] <u>Abney v. United States</u>, 431 U.S. 651, 662 (1977); <u>Richardson v. United States</u>, 468 U.S. 317, 321 (1984) (citing Abney); <u>Menna v. New York</u>, 423 U.S. 61 (1975); <u>Blackledge v. Perry</u>, 417 U.S. 21 (1974); <u>see also</u> <u>Lauro Lines s.r.l. v. Chasser</u>, 490 U.S. 495 (1989) (criteria for interlocutory review).
[154] <u>Id.</u>

dismiss based on a plea of former jeopardy, the defendant is entitled to seek appellate review even though no final judgment has occurred.[155]

Although Saddler's former trial counsel disputed ever claiming that the appeal was "certain" to succeed, he freely admitted that he had high expectations that it would. Trial counsel testified that he had spent a "significant amount of time" researching the double jeopardy issue.[156] He explained that he had consulted with many other attorneys about the issue and that "we were excited as a group to be strong enough in our position that we would be successful with the Court of Appeals."[157] He testified that when he advised Saddler to enter his plea, he believed Saddler had a meritorious double jeopardy claim.[158] In his affidavit, trial counsel stated that he considered the Cooksey plea to be Saddler's "best and *only* avenue" (emphasis added) to preserve the double jeopardy claim on review.[159] He reiterated this point during the evidentiary hearing, stating that he advised Saddler that his "best chance" of preserving the error for review was for Saddler to enter a plea of no contest pursuant to the state's Cooksey plea.[160] He testified that he had no experience with appeals at the time he spoke with Mr. Saddler. This was confirmed when

---

[155] In Artemie v. State, an unpublished order, the Alaska Supreme Court held that a trial court's denial of a motion to dismiss on double jeopardy grounds presumptively qualifies for interlocutory review. File No. S-12026, cited in Tritt v. State, 134 P.3d 364 (Alaska App. 2006). Although the Court of Appeals in Tritt characterized this as a new ruling, the order reiterated long-standing Alaska precedent. See Muller v. State, 478 P.2d 822, 824 (Alaska 1971); Koehler v. State, 519 P. 2d 442 (Alaska 1974); MacPherson v. State, 533 P.2d 1103, 1104 & n. 3 (Alaska 1975); Peel v. State, 751 P.2d 1366, 1368 (Alaska App. 1988).

[156] Exhibit E at 47 ("I absolutely at the time I did this had confidence in the merits of the issue. I spent a significant amount of time, hours and hours and hours, on this issue. I talked to any lawyer who would talk to me who was more experienced than me to get an opinion…")

[157] Exhibit E at 63.

[158] Exhibit E at 71-72 (Q: But at the time of your representation of Mr. Saddler, you yourself had no experience whatever with appeals? A: That's correct. I still don't.")

[159] Exhibit D at 160.

[160] Exhibit E at 41-42 ("Q: …is it accurate to say that you very firmly believed that the trial court had committed procedural error? A: Yes. Q: And did you communicate that to Mr. Saddler? A: Yes. Q: And did you suggest to him that the best resolution of his case was to enter a *Cooksey* plea and then appeal the preserved error? A: Yes.").

Saddler's PCR counsel pointed out that a criminal defendant has a personal right to seek an appeal. Saddler's former attorney expressed some confusion on this point.[161]

The record is clear that at the time he entered his plea, Thomas Saddler was faced with two extremely unattractive and risky choices. His first option was to plead no contest pursuant to the state's <u>Cooksey</u> offer, and preserve the double jeopardy claim for review. Choosing this option necessarily meant forfeiting his right to trial. Saddler's second option was to run the gauntlet of a trial and, if convicted, then raise the double jeopardy claim on appeal. This approach necessarily meant subjecting himself to the "embarrassment, expense and ordeal" of a criminal trial and an uncertain sentence as well as a protracted appeal.

However, Thomas Saddler's choices were not so restricted. Under both the Alaska and the U.S. Constitutions, Saddler was entitled to seek immediate review of the trial court's ruling. Given that the grounds for the double jeopardy claim, which had been granted once before, were clearly not frivolous, there is simply no legitimate explanation (strategic or otherwise) for trial counsel's failure to advise Saddler of this substantive constitutional remedy. It was uncontested that Saddler's primary motivation for entering the plea was to obtain a speedy review of the double jeopardy issue. The interlocutory review process would have certainly taken less time than the <u>Cooksey</u> plea and would have dispelled the atmosphere of wishful thinking that permeated plea negotiations. The failure of trial counsel to consider this right and apprise his client of it unquestionably fell below objective standards of reasonableness one would expect of a minimally competent attorney.[162]

Under <u>Hill</u> and <u>Roe</u>, trial counsel had an obligation to consult with Saddler about pursuing an interlocutory appeal. The failure of trial counsel to do so is *per se* ineffective assistance of counsel, as no competent attorney would have overlooked this fundamental right.[163]

---

[161] Exhibit E at 71-72.

[162] The fact that trial counsel remained ignorant of the right to interlocutory appeal casts doubt on his assertions that he had consulted with "many" other attorneys about the issue. It begs disbelief that these other attorneys also failed to comprehend Saddler's right to interlocutory review.

[163] <u>See</u>, <u>e.g.</u>, <u>Dickerson v. Vaughn</u>, 90 F.3d 87 (1996) (granting habeas relief to petitioners who

## 2. The Court of Appeals unreasonably failed to consider the prejudice to Saddler under Hill v. Lockhart, Missouri v. Frye and Lafler v. Cooper.

The Cooksey plea differed from the interlocutory appeal in another important respect: the Cooksey plea required consent from the prosecutor, which gave the prosecutor leverage during plea negotiations.[164] In exchange for waiving his right to a trial and obtaining speedy review of his double jeopardy claim, Thomas Saddler would pay the price at sentencing. In the words of Saddler's former attorney, "Prosecutors here don't give you jack on a Cooksey plea. You're – you're rolling the dice and making the best decision that you can. And when you are telling the prosecutor you're going to have appeal work to do, you don't get anything in return for that."[165] Although there had once been an offer on the table,[166] at the time of the Cooksey plea, the state did not dismiss or reduce any of the charges, forcing Saddler to enter an across-the-board plea of no contest to all of the pending charges.

Because the Superior Court found that Saddler's counsel had provided competent legal advice, it denied Saddler's post-conviction relief application without directly addressing the question of prejudice. However, the court, relying on the testimony of Saddler's former attorney, insinuated that Saddler's prospects at trial would have been poor. On appeal, the Court of Appeals limited its discussion of prejudice to a single sentence, stating simply that it would not revisit the Superior Court's "findings" that Saddler "was not prejudiced in any manner" by his decision to enter the Cooksey plea. Both the Superior Court and the Court of Appeals seemed to rest on the assumption that in order to prove prejudice, Saddler had

---

entered plea of no contest in reliance on trial counsel incorrect advice that they could appeal trial court's double jeopardy ruling).

[164] See, Cooksey v. State, 524 P.2d 1251, 1255–57 (Alaska 1974); Dow v. State, 155 P.3d 352, 353 (Alaska App. 2007) (defining a Cooksey plea as "a plea of no contest which, with the consent of the State, incorporates the right to litigate a dispositive issue on appeal.")

[165] Exhibit E at 46-47.

[166] Id. ("Q: So your -- just to be clear, whether you might have wanted it or not, there was nothing on the table, there was no offer made to benefit Mr. Saddler as a consequence of his change of plea. It was open sentencing, no agreement? A: I -- it depends on what you're talking about. At one point in time I'm quite sure the state would have made an offer in the case. Q: By the time you did it? A At the time of the Cooksey plea, there would have been nothing on the table.")

the burden of proving that he would have fared better at trial than if he accepted the state offer.

Both the Superior Court and the Court of Appeals adopted an incorrect definition of "prejudice." Under <u>Strickland</u>, prejudice is established when there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been "different." In <u>Hill v. Lockhart</u>, the Supreme Court held that, in the context of plea negotiations, prejudice is established when there is a reasonable probability that the defendant would have rejected the plea and insisted on going to trial. In <u>Missouri v. Frye</u>, the Supreme Court held that <u>Strickland</u> prejudice may also be established if trial counsel failed to apprise the defendant of a plea offer and there is a reasonable probability that, had it been conveyed, the defendant would have accepted the offered plea, and that it would have been accepted by the court and not withdrawn by the prosecution.[167]

Thomas Saddler testified in the proceedings below that the primary consideration behind his decision to accept the state's <u>Cooksey</u> offer was the advice of his attorney that doing so was the "best and only" means of seeking reversal of the trial court's order. Had Saddler been competently advised that he had the right to seek immediate review of the claim, there is a reasonable probability that he would not have accepted the Faustian terms of the state's <u>Cooksey</u> offer, which required frittering away his right to a trial and pleading no contest to all of the charges. Because the record amply establishes that trial counsel's errors resulted in prejudice to Saddler during plea negotiations, the Court of Appeals' conclusion to the contrary was unreasonable. Relief must be granted.

## III.    CONCLUSION

For the foregoing reasons, Mr. Saddler respectfully requests that the court grant the following forms of relief:

---

[167] <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012); <u>Hill</u>, 474 U.S., at 59 ("The ... 'prejudice,' requirement ... focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process").

1. Issue a writ of habeas corpus to have Mr. Saddler brought before the court so that he may be discharged from his unconstitutional confinement;

2. Conduct a hearing at which proof may be offered concerning the allegations in this petition and any affirmative defenses raised by the respondents;

3. Vacate the trial court convictions and remand for a new trial; and

4. Grant any other relief the court deems just and proper.


DATED at Anchorage, Alaska this 5th day of January 2015.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Rich Curtner
Federal Defender
601 West Fifth Avenue, Suite 800
Anchorage, AK 99501
Phone:          907-646-3400
Fax:             907-646-3480
E-Mail:         rich_curtner@fd.org

/s/ Daniel Poulson
Legal Writing and Research Specialist
Alaska Bar No. 0911073
601 West Fifth Avenue, Suite 800
Anchorage, AK  99501
Phone:          907- 646-3400
Fax:             907-646-3480
E-Mail:         Daniel_Poulson@fd.org

CERTIFICATE OF SERVICE:

I certify that on February 5, 2015,
a copy of the *Merit Brief in Support of Petition for Writ of Habeas Corpus* was served electronically on:

Kenneth M. Rosenstein
Assistant Attorney General
Office of Special Prosecutions & Appeals
310 K Street, Suite 308
Anchorage, Alaska
Email:  Ken.Rosenstein@alaska.govmail

/s/ Rich Curtner_____

*Thomas R. Saddler v. Jon Conant*
Case No. 3:14-cv-00105-SLG-DMS                                          Page 40